CORRECTED[1]

# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS

* * * * * * * * * * * * * * * * * * * *
| | |
|---|---|
| RYAN FARRELL, | * |
| | *    No. 19-301V |
| | *    Special Master Christian J. Moran |
| Petitioner, | * |
| v. | * |
| | *    Filed: October 28, 2025 |
| SECRETARY OF HEALTH | * |
| AND HUMAN SERVICES, | * |
| | * |
| Respondent. | * |

* * * * * * * * * * * * * * * * * * * *

<u>Leah VaSahnja Durant and Glenn MacLeod</u>, Law Offices of Leah V. Durant, PLLC, Washington, D.C., for Petitioner;
<u>Elizabeth Andary and Emily Hanson</u>, United States Dep't of Justice, Washington, D.C., for Respondent.

**PUBLISHED DECISION AWARDING INTERIM COMPENSATION**[2]

     Ryan Farrell established that a tetanus, diphtheria, and acellular pertussis ("Tdap") vaccine caused him to suffer from neuromyelitis optica ("NMO"). Entitlement Ruling, issued July 29, 2025, 2025 WL 2409187. He has sought an interim award of compensation for his pain, suffering, and emotional distress. The Secretary opposes an interim award, primarily upon legal (as opposed to factual) grounds. For the reasons explained below, Mr. Farrell is awarded $210,000.00.

---

[1] This decision was corrected to include payment disbursement information.

[2] Because this decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This means the decision will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), the parties have 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. Any changes will appear in the document posted on the website.

I.   **Facts**[3]

Sources of information about Mr. Farrell's condition come from three sources: medical records, his affidavits, and oral testimony from the experts retained.

   A.   **Medical Records**

Mr. Farrell was born in 1976. He worked as an electric lineman. While working, he cut his finger. Exhibit 6 at 15-16. As a result, he received the causal Tdap vaccine on Wednesday, February 15, 2017. Id.

Due to an "inability to see out of his left eye, difficulty urinating and lower extremity numbness and tingling in the setting of a recent illness," Mr. Farrell sought care at Needham Emergency Room on Wednesday, March 8, 2017. Exhibit 5 at 10. Mr. Farrell informed the medical staff that "over the weekend he developed what sounds like a flulike illness associated with cough, congestion, malaise and subjective chills." Id. Testing for various infectious agents was negative. Id. at 11, 17. Mr. Farrell was transferred to a hospital in Boston. Id. at 11.

In the emergency room at Beth Israel Deaconess Hospital, Mr. Farrell rated his pain as a six out of ten. Exhibit 3 at 27. Mr. Farrell also reported "pain with movement" during his initial consultation with a neurologist in the hospital. Id. at 48. Other problems included urine and stool retention. Based upon this presentation, the neurologist was concerned about various demyelinating conditions and admitted Mr. Farrell to the hospital. Id.

While in the hospital, Mr. Farrell underwent two MRIs. An MRI of his head showed a hyperintense signal in the left optic nerve. Exhibit 3 at 8 (March 9, 2017). An MRI of his cervical and thoracic spine also showed a hyperintense signal from C5-6 to C7-T1. Id. Based upon these results he was diagnosed with "likely" "neuromyelitis optica." Id. This diagnosis was reached despite a lack of antibodies typically found in NMO patients.

The initial nurse's assessment memorialized that Mr. Farrell complained of chronic and intermittent pain in his lower back at baselines. Exhibit 3 at 38. Mr. Farrell received occupational therapy and physical therapy. See id. at 54-58 (initial occupational therapy evaluation) and 65-68 (initial physical therapy evaluation). Mr. Farrell was treated with Solu-Medrol for five days and rapidly improved.[4] He was discharged on March 13, 2017. Exhibit 3 at 8-9. At the time of discharge, Mr. Farrell could walk independently. Id. at 7.

When out of the hospital, Mr. Farrell saw a neurologist, Jacob Sloane. Dr. Sloane's impression was that Mr. Farrell suffered from NMO. Exhibit 3 at 205 (Mar. 16, 2017). The

---

[3] A portion of the evidence summarized here repeats from the July 29, 2025 Entitlement ruling. However, this decision emphasizes the evidence showing Mr. Farrell's pain, suffering, and emotional distress.

[4] "Solu-Medrol" is a trademark for methyl-prednisolone sodium succinate. Dorland's Illus. Med. Dict. 1703 (33rd ed.). Methylprednisolone, in turn, is an anti-inflammatory and immunosuppressant. Id. at 1137.

experts retained for this litigation agree with the diagnosis of NMO. Dr. Sloane prescribed Rituxan. Exhibit 3 at 206, 208.[5]

Mr. Farrell's physical therapy, which started during the hospitalization, continued on an out-patient basis. Mr. Farrell attended physical therapy roughly once every other week for five sessions from March 17, 2017 to May 5, 2017. Exhibit 2 at 52-67. At the end of this period, Mr. Farrell reported that he had improved and was planning to return to work. Id. at 64.

Mr. Farrell saw his neurologist, Dr. Sloane, in follow-up on June 15, 2017. Dr. Sloane documented that Mr. Farrell had returned to work as an electrician, working on power lines, but he is "clumsier, running into things/tripping or squeezing things too tightly in his hands." Exhibit 3 at 216. Dr. Sloane also recorded that Mr. Farrell was continuing "to have pain in his lower back especially when he bends over. It is an electrical pain that shoots down his spine and into his legs. It is much worse in the heat." Id.

Dr. Sloane also explained how the disease was affecting Mr. Farrell:

> Overall, he has noted that he becomes very tired easily and has trouble getting out of bed. He feels depression and is having trouble sleeping. Also has low energy levels, decreased concentration. He does not want to take any medications for depression. He feels overwhelmed by the diagnosis but is slowly starting to adapt.

Id. at 215. Although Mr. Farrell's motor strength was normal, he had decreased sensation. Id. at 217. His gait was narrow based. Dr. Sloane ordered more imaging, which showed the previous lesions had resolved. Id. at 247-48 (July 6, 2017).

In August, Mr. Farrell missed work due to illness. Exhibit 57 at 63. Apparently, he had a flare-up of symptoms in the hot weather. See Exhibit 2 at 68. In early August, he received three more infusions of Solu-Medrol. Exhibit 3 at 223-229.

Dr. Sloane saw Mr. Farrell again on September 18, 2017. Exhibit 3 at 232. Dr. Farrell documented that Mr. Farrell was on short-term disability and would continue for "the full duration of several months allowable." Id. at 233. A new problem was "pressure/achyness to the L foot sole." Id. at 232. Dr. Sloane's impression included that Mr. Farrell has "intermittent pain issues." Id. at 235.

Following this appointment with Dr. Sloane, Mr. Farrell resumed physical therapy. From September 22, 2017 to December 8, 2017, Mr. Farrell had five sessions. Exhibit 2 at 68-82. These records note, without much detail, that Mr. Farrell had pain. The final report is not particularly informative, stating that Mr. Farrell has good capacity for advancement.

---

[5] Rituxan "is an anti-CD19 monoclonal antibody that targets B cells that have that receptor." Tr. at 106. Rituxan is a trademark for a preparation of rituximab. Dorland's at 1623.

Mr. Farrell returned to Dr. Sloane on December 14, 2017.  Exhibit 3 at 242-45.  Dr. Sloane recorded that "He is trying to get a more sedentary job so his health is not at risk."  Id. at 242.  Generally, the December 14, 2017 record resembles the September 18, 2017 record, including a note that Mr. Farrell is having "intermittent pain issues."  Id. at 245.  Dr. Sloane added a prescription for tramadol for pain control.  Id.[6]

Mr. Farrell sought a second opinion about NMO from a neurologist, Salvatore Napoli.  Exhibit 4 at 2 (Dec. 19, 2017).  The history of present illness recounts that "The main issue now appears to be the pain."[7]  More specifically, "he has cramping of the feet, he has [tightening] of his legs and feet" and "he will have severe pain of his lower back as well."  Id.  Dr. Napoli's examination more or less matched what Dr. Sloane had been finding.  Dr. Napoli's assessment included that Mr. Farrell "has residual pain in the lower extremities, spasticity, as well as difficulties with his gait. . . . Our plan will be to continue rituximab therapy or even transition to ocrelizumab."  Id. at 4.  Dr. Napoli continued that Mr. Farrell's "main issue of pain may also be related to spasticity so we will start him on baclofen and I will give him Vicodin as needed. . . We may also consider tizanidine or medicinal cannabinoid."  Id.

In the next two appointments, Mr. Farrell continued to complain about pain, although the pain improved slightly.  Exhibit 4 at 6-13.  At the end of January 2017, Mr. Farrell had a flare of neck pain, which Dr. Napoli characterized as a Lhermitte's-like phenomenon.  Id. at 14-25.

Mr. Farrell participated in another course of physical therapy in February 2018.  Exhibit 42.  He attended about five sessions.   In the initial evaluation, the physical therapist obtained a history of Mr. Farrell's neurologic problem.  In this context, the therapist noted: "He is struggling with the mental health aspect of dealing with a disabling disease and feels overwhelmed with the treatment and prognosis."  Id. at 97.  He reported becoming fatigued when walking 15 minutes.  Id.  He had a numbing pain in his both feet, which ranged from 3-7, and sharp pain in his cervical spine, which ranged from 3-7.  Id.  The last physical therapy appointment was on February 27, 2018.  Id. at 38.  Mr. Farrell appeared to have apologized for canceling sessions in the previous week, explaining, "'The depression of all this is getting to be too much.'"  The assessment also reflects this concern:  "Pt notes extreme difficulty dealing with chronic pain, overwhelming nature of dealing with potential disability from work, mounting expenses."  Id. at 39.

By the middle of February, Mr. Farrell was requesting that Dr. Napoli prescribe stronger medication for pain, such as oxycodone.  Dr. Napoli gave him a one-month supply but stated that Mr. Farrell should seek assistance from pain management.  Exhibit 4 at 27.  Although the oxycodone helped, within about two weeks, Mr. Farrell reported "pain is all over but worse on the R side in both the arm and the leg, some burning quality."  Id. at 30 (Mar. 1, 2018).  Dr.

---

[6] "Tramadol hydrochloride" is an "opioid analgesic used for the treatment of moderate to moderately severed pain."  Dorland's at 1920.

[7] Some of Dr. Napoli's records are written in all capital letters.  This decision uses more traditional capitalization without specifically noting the alteration.

Napoli added another medication, Cymbalta.[8]  Although Dr. Napoli considered referring him to physical therapy, Mr. Farrell said that physical therapy is painful.  Id. at 31.

On March 8, 2018, Mr. Farrell reported concerns about the effectiveness of Cymbalta in controlling his pain.  Exhibit 4 at 34.  Dr. Napoli increased the dose of Cymbalta.  Id. at 35.  Dr. Napoli stated: "patient is disabled from all gainful employment."  Id. at 35.

With the increase in oxycodone, Mr. Farrell's pain improved from 8/10 to 6/10.  Exhibit 4 at 38 (Mar. 16, 2018).  In this visit, Mr. Farrell informed Dr. Napoli that he (Mr. Farrell) thinks he has not "ever returned to baseline after initial attack last March."  Id. at 39.

Due to the continued pain, Dr. Napoli introduced a new medication, Acthar.[9]  Exhibit 4 at 42 (Mar. 20, 2018).  Mr. Farrell returned to Dr. Napoli about two weeks later again stating he "has been in pain all the time."  Id. at 46.  Dr. Napoli also documented that Mr. Farrell got "a pill from his friend.  A urine test did show positive fentanyl."  Id.  Dr. Napoli and his nurse practitioner, Stacey Murray, spoke to Mr. Farrell about their policy and planned to taper Mr. Farrell off oxycodone.  Then, Mr. Farrell was expected to resume pain management.  Id. at 47.

About two weeks later, Mr. Farrell was promising to go to pain management.  Exhibit 4 at 51 (Apr. 20, 2018).  In the meantime, Mr. Farrell stated that "he has stopped taking opiate-based medications."  Id.  Dr. Napoli advised that due to Mr. Farrell's weakness, he should be on disability.  Id.[10]

As Dr. Napoli had been recommending, Mr. Farrell saw a specialist in pain management, Sherif Algendy, on April 25, 2018.  Exhibit 8.  Mr. Farrell reported neck and lower back pain that averaged 7 out of 10 with a 10 being the worst pain.  Id. at 1.  The history reports that Mr. Farrell stopped oxycodone 24 days ago.  The plan was to increase the dosage of Cymbalta.  Another alternative was to try CBD.  Id. at 3.

Mr. Farrell returned to Dr. Napoli on January 11, 2019.  Exhibit 44 at 108.  The reason for this appointment was "NMO/letter."  Dr. Napoli recorded that although Mr. Farrell was "feeling improved," "he is still having chronic issues, feet, hip, and back."  Id.  Other specific problems included feeling squeezed like by a band, a difficulty with urination, a difficulty with moving his

---

[8] Cymbalta is a trademark for duloxetine hydrochloride.  Dorland's at 452.  Duloxetine hydrochloride, in turn, is a medication "used for the treatment of major depressive disorder and the relief of pain in diabetic neuropathy."  Id. at 566.

[9] Acthar is a trademark for corticotropin.  Dorland's at 21.  Corticotropin, in turn, stimulates the production of corticosteroids.  Id. at 416-17.

[10] A medical record from December 31, 2024 states that Mr. Farrell had a fentanyl overdose in 2021.  In this context, Mr. Farrell reported that he had "past opioid addiction due to frequent pain in the setting of neuromyelitis optica."  Exhibit 55 at 45.  Another December 2024 medical record suggests that opioid addiction occurred prior to 2021 as Mr. Farrell "detoxed in 2017."  Id. at 68.

bowels, and leg fatigue and weakness.  Id. at 108.  Dr. Napoli ordered labs and prescribed medications.

This appointment with Dr. Napoli led to another course of physical therapy, which started on January 15, 2019.  Exhibit 45 at 73.  Mr. Farrell stated that he "feels like always being squeezed tight or wearing [a] belt."  Id.  Before his injury, he walked 1-2 miles with a dog.  Currently, he could walk about 0.25 miles and he tripped when he did not pick up his boots.  He again reported pain in his back and both feet.  The physical therapist observed problems with Mr. Farrell's gait.  Id. at 76.

Mr. Farrell attended about 17 sessions of physical therapy at the beginning of 2019.  He did not attend an appointment scheduled for May 22, 2019 because he planned to exercise at his house.  Exhibit 45 at 3.  In the previous session, which was May 1, 2019, he reported that his "walking is getting better and that he is getting more strength in his legs."  Id. at 7.

Mr. Farrell returned to Dr. Napoli's practice on May 16, 2019, when he saw Nurse Practitioner Murray.  Exhibit 44 at 99.  The chief complaint was: "Follow up NMO.  SS [probably Social Security] hearing 5/21/2019."  Mr. Farrell reported that "he has been feeling 'okay.'"  Id.  Mr. Farrell "continues to have 'tightening' sensations, occasionally described as electrical shock in the spine or in the legs.  [T]his is intermittent but 'when it happens it is severe.'"  Id.  The plan was continuing his medication, Ocrevus.  Dr. Napoli and Ms. Murray supported his application for benefits because Mr. Farrell "can no longer perform his job function[s]."  Id. at 100.

Across the next approximately 18 months, Mr. Farrell returned to Dr. Napoli's practice approximately every month.  Exhibit 44 at 39-97.  During this time, Mr. Farrell continued to receive various treatments.  See, e.g., id. at 82 (Dec. 17, 20219 for Ocrevus), at 77 (May 6, 2020 for medical marijuana), at 63 (June 25, 2020 for Solumedrol), at 52 (July 13, 2020 for Rituximab), at 47 (Aug. 7, 2020 for Botox).  Occasionally, Mr. Farrell reported exacerbations.  See, e.g., id. at 56 (June 29, 2020).

Mr. Farrell reported another exacerbation on December 31, 2020.  Exhibit 44 at 36.  Despite treatment, Mr. Farrell did not improve.  Thus, on January 12, 2021, he sought care from the emergency department at Newton-Wellesley Hospital.  Exhibit 46 at 3.  He complained about lower abdominal pressure, including urinary retention and an inability to move his bladder.  Medical personnel consulted neurologists at Massachusetts General Hospital.  Dr. Michael Levy offered to admit Mr. Farrell to his service but no beds were available.  Id. at 9.  So, Mr. Farrell was admitted to Newton-Wellesley Hospital.

While in the hospital, Mr. Farrell underwent a series of tests, including another round of MRIs.  The MRI of the cervical spine and thoracic spine showed degenerative changes.  Exhibit 46 at 41, 50.  The doctor responsible for his treatment considered these results to be unrevealing.  Id. at 23.  Mr. Farrell was discharged on January 13, 2021.  Id. at 23.

On February 23, 2021, Dr. Levy saw Mr. Farrell virtually for a new patient consult.  Exhibit 43 at 25-27.  On June 15, 2021, Dr. Levy saw Mr. Farrell again and assessed that Mr. Farrell was "a 45[-year-old] gentlemen with seronegative, monophasic neuromyelitis optica in

6

2017 following a vaccination." Id. at 15.  Dr. Levy stated that Mr. Farrell "remains on rituximab which may be preventing future relapses."  Dr. Levy also memorialized that "Symptoms continue to flare periodically approximately twice per year."  Dr. Levy advised Mr. Farrell to follow-up in about six months.  Id. at 18.

On December 7, 2021, Mr. Farrell returned to see Dr. Levy in-person.  Dr. Levy stated that Mr. Farrell has "been managed with high-dose steroids and rituximab." Exhibit 43 at 3.  Dr. Levy memorialized that "Mr. Farrell reports that he weaned off Lyrica and only uses marijuana and it works for him. He still feels the neuropathy in his feet, which is a little uncomfortable." Id.  "Currently, his neurological function is improving. He is exercising every day and walking. He eats well and feels healthy. He feels some sensation feelings in his hands that comes and goes." Id.  "For preventive treatment, Mr. Farrell previously used rituximab, last used in January in 2021. He is no longer using rituximab as there is no indication that he is at risk for recurrent disease." Id.  Mr. Farrell again expressed an interest in returning to work by, perhaps, using medical marijuana. Id. at 8.

In between appointments with Dr. Levy in 2021, Mr. Farrell returned to Dr. Napoli's practice. See Exhibit 50.

Medical appointments in 2022 appear relatively infrequent.  On June 22, 2022, Mr. Farrell saw Dr. Napoli.  Mr. Farrell "reports feeling good.  He hasn't been in the hospital in over a year which he feels really good about. He was stating that he did not have the greatest first few years when he was first diagnosed with MS but today he feels great. No complaints."[11] Exhibit 50 at 7.  Under the history of present illness, Mr. Farrell denied "any new issues.  He has been limited in his medicine use.  He takes Lyrica as needed." Dr. Napoli added that his "main symptoms are hip and neck pain.  He has spasticity and leg pain and leg fatigue with any prolonged distance." Id.  Dr. Napoli recommended repeat MRIs.

On February 14, 2023, Mr. Farrell returned to see Dr. Levy and Dr. Anderson.  Exhibit 51 at 4.  For the interval history, Mr. Farrell reported general improvement:

> Mr. Farrell states that he has been keeping active and feels that he has almost returned to his baseline. He is currently retired from his previous occupation. He still does not think his balance is where it needed to be to continue with that occupation. [Review of systems] was negative other than paresthesias in the feet at night, persistent urinary retention, and occasional "flashes" in his vision at night. He was even able to walk up 7 flights up for today's appt. He is not currently on any medications other than Adderall and occasional marijuana gummies at night for sleep.

Id. at 2.  Mr. Farrell was advised to follow up in two years.  Id. at 4.

The theme of general improvement is also reflected in an August 8, 2023 medical record prepared by a nurse practitioner in Dr. Napoli's practice, Beverly Wang.  Exhibit 50 at 5-6.  Ms.

---

[11] The reference to MS (or multiple sclerosis) is mistaken.

Wang memorialized that Mr. Farrell is currently not on any disease modifying therapy. He occasionally gets "pain in the neck or feet with weather changes." Id. at 5. Although Dr. Napoli had recommended repeat MRIs in June 2022, Mr. Farrell had not gotten them. Mr. Farrell again deferred more MRIs. The plan was for follow up in six months.

By the next appointment, which was by video on April 12, 2024, Mr. Farrell had not obtained another set of MRIs. Exhibit 50 at 3. Mr. Farrell reported "neuropathic pain in his bilateral feet; reports this returned about 3-4 weeks ago as he has been on his feet more at work." Id. Dr. Napoli prescribed Lyrica and again ordered MRIs.

At the end of December 2024, Mr. Farrell was hospitalized for significant cardiac problems. Exhibit 55 at 49. He received treatment for heart failure in 2025. Exhibit 55, passim.

### B. Affidavits

Mr. Farrell submitted two affidavits, both filed relatively early in the litigation. In his first affidavit, which was signed on May 3, 2019, Mr. Farrell described his initial hospitalization in March 2017. Mr. Farrell "thought [he] might die." Exhibit 10 ¶ 1. Mr. Farrell also recounted that he had difficulty returning to work and the "emotional and financial worries [he has] when this first happened and still have [are] difficult to describe. [His] role as the breadwinner, husband, & father was threatened." Id. ¶ 2. He further averred that he "spend[s] many long, lonely days wondering if [his] life will ever get back to normal." Id. ¶ 3.

Mr. Farrell provided some general information about his potential damages in an affidavit that was also signed in May 2019. Exhibit 11. Mr. Farrell stated that activities that he could no longer enjoy included: playing with his children, driving long distances, walking long distances, running, and working in the yard. Id. ¶ 10.

Although Mr. Farrell was invited to testify at the hearing, he did not testify. However, Mr. Farrell and his family attended the hearing.

### C. Testimony from Treating Doctors

As discussed below, Mr. Farrell presented reports and oral testimony from Dr. Napoli and Dr. Levy. In particular, Dr. Napoli emphasized that Mr. Farrell wanted to return to work. Tr. 25-27, 107-109. Dr. Napoli stated that Mr. Farrell "had scars to the battle that still remains." Tr. 108. Dr. Napoli worried that problems with stamina might impair Mr. Farrell's ability to work. Tr. 109.

## II. Procedural History[12]

Mr. Farrell initiated this case by filing a petition on February 26, 2019. The Secretary evaluated this material and recommended that compensation be denied. Resp't's Rep., filed pursuant to Vaccine Rule 4, on March 12, 2020. In the Secretary's view, Dr. Napoli's January 28,

---

[12] A more extensive procedural history can be found in the July 29, 2025 Entitlement Ruling.

8

2019 letter was insufficient to establish that the tetanus vaccine caused Mr. Farrell's NMO. Id. at 9-10.

The parties developed evidence from experts over the next few years. For Mr. Farrell, Dr. Napoli wrote two reports: Exhibit 12, filed October 26, 2020; and Exhibit 39, filed June 4, 2021. Dr. Levy also wrote two reports: Exhibit 34, filed May 14, 2021; and Exhibit 41, filed November 23, 2021.

The Secretary's pair of experts wrote a total of five reports. Dr. He's reports are Exhibit A, filed March 1, 2021; Exhibit E, filed October 5, 2021; and Exhibit G, filed January 24, 2022. Dr. Cohen's reports are Exhibits C, filed March 1, 2021; and Exhibit F, filed October 5, 2021.

Periodically, the topic of settlement was raised. On some occasions, the Secretary declined to explore an informal resolution. See Resp't's Status Rep., filed Jan. 27, 2020; Resp't's Status Rep., filed Aug. 6, 2021; Order, issued Mar. 11, 2022; Order, issued April 17, 2024; Order, issued Aug. 8, 2024.[13] In any event, the parties did not reach a settlement, and the case proceeded to a hearing.

After a hearing and briefing, Mr. Farrell was found entitled to compensation. Entitlement Ruling, issued July 29, 2025, 2025 WL 2409187.. As part of the process for determining the amount of damages, Mr. Farrell anticipates claiming a substantial amount of compensation for his lost earnings. See order, issued July 23, 2025. Whether this claim is justified to any extent remains undetermined.

Mr. Farrell requested an award of compensation on an interim basis via the pending motion, filed on Aug. 28, 2025. Mr. Farrell presents essentially three points: (1) as a matter of law, interim awards of compensation are available to petitioners in the Vaccine Program; (2) as a matter of discretion, he should receive an interim award of compensation; and (3) an appropriate amount of compensation for his pain, suffering, and emotional distress is $250,000. The Secretary opposes and challenges each of the three points as discussed below. Resp't's Resp., filed Sep. 9, 2025. Mr. Farrell defended his request. Pet'r's Reply, filed Sep. 26, 2025. With the submission of the reply, the motion is ready for adjudication.

### III.  Analysis Part One: Are Interim Awards of Compensation Available to Petitioners in the Vaccine Program?

Interim awards of compensation have happened before. The parties cite the same series of cases. See Pet'r's Mot. at 2-3; Resp't's Resp. at 2-3. In chronological order, starting with the earliest, these are: Lerwick v. Sec'y of Health & Hum. Servs., No. 06-847V, 2014 WL 1897656 (Fed. Cl. Spec. Mstr. Apr. 16, 2014); Day v. Sec'y of Health & Hum. Servs., No. 12-630V, 2016 WL 3457749 (Fed. Cl. Spec. Mstr. May 31, 2016), mot. for rev. denied, 129 Fed. Cl. 450 (2016); Fairchild v. Sec'y of Health & Hum. Servs., No. 13-487V, 2017 WL 6892899 (Fed. Cl. Spec. Mstr. Dec. 1, 2017), mot. for rev. denied, 138 Fed. Cl. 29 (2018), app. dismissed, No. 2018-2320,

---

[13] It appears that the Secretary may have communicated an offer. See Pet'r's Status Rep., filed July 11, 2024.

9

2018 WL 11450386, at *1 (Fed. Cir. Dec. 28, 2018); and Schettl v. Sec'y of Health & Hum. Servs., No. 14-422V, 2020 WL 1912224 (Fed. Cl. Spec. Mstr. Mar. 25, 2020).

The Secretary notes that these opinions do not create binding precedent. This is true. Boatmon v. Sec'y of Health & Hum. Servs., 941 F.3d 1351, 1358 (Fed. Cir. 2019).

On the other hand, the Secretary does not meaningfully engage with these opinions' reasoning. For example, the Secretary contends that the "Vaccine Act does not contemplate multiple damages judgments in the same case." Resp't's Resp. at 3. Yet, in those cases, multiple damages judgments were issued.

Moreover, in two cases, the Secretary challenged a special master's determination that interim awards of compensation are available by filing a motion for review. (The Secretary did not challenge the ruling finding entitlement to compensation.) In both cases (Day and Fairchild), the Court of Federal Claims, which reviewed the special master's holding that the Vaccine Act allows for interim awards of compensation without deference, also held that petitioners may receive an interim award of compensation. Finally, to the extent that the Secretary were concerned about this interpretation, the Secretary could have appealed to the Federal Circuit. The Secretary took advantage of this option in Fairchild but then dismissed the appeal.

Mr. Farrell makes a similar argument with respect to the Fairchild appeal to the Federal Circuit that the Secretary dismissed:

> If the Secretary wanted to maintain arguments against awards of compensation on an interim basis, it is incumbent on respondent to file a motion for review and, if necessary, to file an appeal so that judges can resolve the issue. Consistently raising an argument before special masters without taking the steps to obtain a definitive interpretation wastes resources of litigants and special masters.

Pet'r's Reply, at 3, citing Nuttal v. Sec'y of Health & Hum. Servs., No. 07–810V, 2011 WL 5926131, at *2 (Fed. Cl. Spec. Mstr. Nov. 4, 2011) (discussing the Secretary's arguments against awarding attorneys' fees and costs on an interim basis).

In accord with the non-binding authorities cited above, the undersigned holds that awards of interim compensation are available to petitioners in the Vaccine Program.

### IV.   Analysis Part Two: Is an Interim Award of Compensation Appropriate for Mr. Farrell?

Although as a matter of statutory interpretation interim awards of compensation are consistent with the Vaccine Act, petitioners are not always entitled to an interim award. Instead, special masters exercise discretion in determining whether an award is appropriate.

The parties differ. Mr. Farrell emphasizes that the litigation has been pending for more than six years (Pet'r's Mot. at 2) and that a lack of gainful employment has made him "in dire

10

need of financial assistance" (Pet'r's Mot. at 11). In contrast, the Secretary suggests that if interim awards of compensation are allowed, then they should be reserved for cases with extraordinary circumstances. Resp't's Resp. at 4, citing Day, 2016 WL 3457749, at *5. The Secretary argues that Mr. Farrell has not presented evidence documenting his financial circumstances and points out that he received a payment for his injury via a Workers' Compensation claim. The Secretary also notes that the resolution of the damages portion of the case has not been protracted. Id. at 5. Finally, the Secretary suggests that the Secretary's defense of the entitlement portion of the claim should weigh against an award of compensation on an interim basis because "a motion for review of the ruling on entitlement is being seriously contemplated." Id. at 7.

Although Day appears to be limit interim decisions awarding compensation to extraordinary circumstances, the undersigned is not sure that they should be so restricted. Three factors support making interim compensation decision more available. First, the general oft-repeated policy of the Vaccine Program is "to award compensation to vaccine-injured persons quickly." Cottingham v. Sec'y of Health & Hum. Servs., 971 F.3d 1337, 1343 (Fed. Cir. 2020); accord Koston v. Sec'y of Health & Hum. Servs., 947 F.2d 157, 161 (Fed. Cir. 1992). An interim award, which delivers at least some compensation, more speedily is in accord with Congress's purpose.

Here, Mr. Farrell has qualified as someone who has demonstrated with preponderant evidence that a vaccine harmed him.[14] Thus, resolution of the amount of compensation to which he is entitled should happen "quickly." But this tends not to happen.

The time for determining damages is the second reason supporting an interim award of compensation. The process for resolving damages when petitioners seek compensation for unreimbursed medical expenses via a life care plan and compensation for lost future earnings tends to take at least one year minimum. In the damages phase, the parties tend to cooperate. After a ruling finding entitlement in off-Table cases, most cases are resolved via a proffer. The parties deserve credit for reaching agreements with each other that minimize the number of issues in damages that the special masters are called upon to resolve.

---

[14] Although the Secretary states that he might file a motion for review challenging the Entitlement Ruling, this factor plays almost no role in determining whether Mr. Farrell should be awarded compensation on an interim basis. The Secretary possesses a right to contest entitlement by seeking further review. But, the Secretary's right does not prevent Mr. Farrell from exercising his right to seek an award of compensation on an interim basis. Moreover, if anything, the possibility that the Secretary might challenge the entitlement ruling seems to support an earlier decision awarding a portion of the compensation to which Mr. Farrell might be entitled. If the entitlement ruling were overturned sooner, then the parties would not devote so much time and resources to determining the amount of compensation. See, e.g., Dobrydnev v. Sec'y of Health & Hum. Servs., 566 Fed. App'x 976 (Fed. Cir. 2014) (reinstating a special master's decision that petitioner was not entitled to compensation and reversing judgment awarding compensation).

These good-faith efforts from the parties necessarily take time. In general, neither petitioners nor respondent are necessarily at fault for time it takes to process damages. It is usually the case that complicated issues simply require the input of many busy professionals.

Third, the time for processing damages hurts petitioners, who are awaiting compensation. The delay cannot be compensated because special masters cannot award interest. Edgar v. Sec'y of Health & Hum. Servs., 29 Fed Cl. 339, 344 (1993). The significance of a lack of interest can be illustrated in a chart based upon interest compounded once per year.

| Date Compensation Awarded | Amount Awarded | Interest Rate | Value to Mr. Farrell on 11/1/2025 | Value to Mr. Farrell on 11/1/2026 | Value to Mr. Farrell on 11/1/2027 |
|---|---|---|---|---|---|
| 11/1/2025 | $210,000 | 4% | $210,000 | $218,400 | $227,136 |
| 11/1/2026 | $210,000 | 4% | none | $210,000 | $218,400 |
| 11/1/2027 | $210,000 | 4% | none | none | $210,000 |

The three different rows reflect three scenarios. The first row (compensation awarded on Nov. 1, 2025) reflects an award of interim compensation. The second row (compensation awarded on Nov. 1, 2026) reflects a potentially optimistic resolution of damages with the damages process taking about one year. The third row (compensation awarded on November 1, 2027) reflects a more protracted process.

As this chart illustrates, an award of compensation to Mr. Farrell on an interim basis delivers money for his use and enjoyment more quickly and the earlier award of compensation results in a greater amount of money from his perspective. As someone who is entitled to compensation, Mr. Farrell should receive some compensation as quickly as possible. Thus, he is not required to demonstrate extraordinary circumstances.[15] Therefore, awarding Mr. Farrell compensation on an interim basis is appropriate.

### V. Analysis Part Three: What Is A Reasonable Amount of Compensation for Pain, Suffering, and Emotional Distress?

The Vaccine Act provides statutory guidance regarding awards for pain and suffering.

---

[15] On the other hand, as a practical matter, limits on judicial resources may preclude interim awards of compensation routinely. In the roughly analogous circumstance of awards of attorneys' fees and costs, sometimes special masters prioritize resolving amounts of final fees over resolving amounts of interim fees. This prioritization of some cases is an inevitable part of docket management. See Landis v. N. Am. Co., 299 U.S. 248, 255-55 (1936) (recognizing trial courts' discretion to manage their dockets); Amado v. Microsoft Corp., 517 F.3d 1353, 1358 (Fed. Cir. 2008) (trial courts "are afforded broad discretion to control and manage their dockets, including the authority to decide the order in which they hear and decide issues pending before them").

> Compensation awarded under the Program to a petitioner under section 300aa-11 of this title for a vaccine-related injury or death associated with the administration of a vaccine after October 1, 1988, shall include the following: . . . .
>
> (4) For actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000.

42 U.S.C. § 300aa-15. "Successful claimants receive compensation for medical, rehabilitation, counseling, special education, and vocational training expenses; diminished earning capacity; pain and suffering; and $250,000 for vaccine-related deaths." Bruesewitz v. Wyeth LLC, 562 U.S. 223, 229 (2011).

With respect to the amount of compensation, the parties' advocacy could have been better. Mr. Farrell seeks the maximum amount. Pet'r's Mot. at 13. However, he did not cite any analogous cases. The Secretary did not propose any amount as reasonable. See Resp't's Resp. at 7-8. The Secretary also fails to cite any comparable cases. Instead, the Secretary points out that a January 12, 2021 MRI of Mr. Farrell's spine shows that he has developed degenerative changes. Id. at 8, citing Exhibit 46 at 41. Thus, the Secretary argues that an evaluation of Mr. Farrell's pain and suffering should be deferred until the record is further developed by obtaining opinions from an expert.

The Secretary's contention that further development is required is misguided for at least two reasons. First, the record already contains the opinion of two experts, Doctors Napoli and Levy. To the extent that the Secretary wanted to counter these opinions, the Secretary has not shown that he has taken any steps to do so. For example, during the entitlement phase, the Secretary retained a neurologist, Dr. Cohen, and presumably, Dr. Cohen, remains available to comment upon whether problems Mr. Farrell experienced after January 2021, when the MRI detected degenerative changes, were attributable to NMO. Actually, Dr. Cohen agreed that Mr. Farrell has "had significant neurological deficits." Tr. 234. The Secretary did not propose any schedule by which he might present the opinions of an expert. Mr. Farrell does not have to wait.

Second, and more importantly, the Secretary's argument appears to focus on the trees, not the forest. At the broad level, Mr. Farrell was diagnosed with NMO, and the Secretary does not dispute the diagnosis. See Exhibit C (Dr. Cohen's report) at 5. The onset was in March 2017. This means that he has suffered from NMO for more than eight years. Although Mr. Farrell experienced other health problems during these eight years, none of those other problems eliminate NMO. Furthermore, there is ample information about Mr. Farrell's physical and mental health from the NMO. The Secretary could have analyzed this evidence to propose an amount of compensation for the pain, suffering, and emotional distress that flowed from Mr. Farrell's NMO. Except for citing the January 2021 MRI and one other record, the Secretary's response to Mr. Farrell's motion for an award for his pain, suffering, and emotional distress omits any discussion of Mr. Farrell's medical records. The Secretary's failure to propose a specific number may be interpreted as a waiver of any argument regarding the amount of the pain and suffering. See Vaccine Rule 8(f).

13

Highlights from the evidence about Mr. Farrell's pain, suffering, and emotional distress include the following:

- He was hospitalized for about five days in March 2017. Exhibit 3 at 7.

- During this time, Mr. Farrell feared he might die. Exhibit 10 ¶ 1.

- NMO affected Mr. Farrell's mental well-being. Exhibit 3 at 215, Exhibit 42 at 97; see also Exhibit 50 at 7.

- NMO complicated his employment. Thus, Mr. Farrell worried about the financial circumstances for his family and his himself.[16]

- From onset in March 2017 to about February 2021, Mr. Farrell's problems waxed and waned for which he took a variety of medications. His symptoms flared about twice per year. Exhibit 43 at 15.

- By the end of 2021, Mr. Farrell was taking relatively little medication to control his residual problems such as paresthesias. Exhibit 43 at 3, Exhibit 50 at 7.

- Despite Dr. Napoli's recommendation, Mr. Farrell did not obtain additional MRIs after June 2022. See Exhibit 50 at 3. This lack of follow up suggests that the neurologic problems were not weighing heavily on Mr. Farrell's mind.

In short, Mr. Farrell experienced four rough years (March 2017 to February 2021). But, the approximately 4.5 years from February 2021 to the present have been comparatively good.

When considered as a whole, the evidence preponderantly supports an award for pain, suffering, and emotional distress at $210,000. This amount compensates for pain, suffering, and emotional distress incurred through September 1, 2025. Mr. Farrell remains eligible for an additional award of pain, suffering, and emotional distress incurred after September 1, 2025.

---

[16] Mr. Farrell's worries about his financial problems are noted. However, this aspect does not contribute significantly to the assessment of his pain, suffering, and emotional distress as the evidence is not complete.

A family's finances depend upon both money received and money spent. Mr. Farrell has presented negligible information about spending money.

For the other side of the ledger concerning receiving money, Mr. Farrell's evidence is also not complete. Although Mr. Farrell states that after his NMO, he has worked little (Pet'r's Status Rep., filed Sep. 22, 2025), medical records refer to him working at least sometimes. See Exhibit 55 at 49, 60 (stating he worked until 2022), and 148. Further, Mr. Farrell received money through Workers' Compensation. Exhibit 56 at 8. He also is receiving disability benefits through Social Security. Id. at 12.

The statement that evidence about Mr. Farrell's financial problems is "incomplete" does not mean that he has not worried about his finances. But, when a claim for pain, suffering, and emotional distress is based, in part, on financial problems due to a vaccine-related injury, more information about financial circumstances should be provided.

Some of this post-September 1, 2025 pain, suffering, and emotional distress might include pain, suffering, and emotional distress that Mr. Farrell is expected to incur after the date of any judgment, which is usually termed "future pain and suffering." This topic will be discussed at the next status conference. As just stated, the amount is based upon the evidence in Mr. Farrell's case. The amount of past pain, suffering, and emotional distress also appears consistent with awards in cases with another demyelinating disease, Guillain-Barré syndrome. See, e.g., Drcar v. Sec'y of Health & Hum. Servs., No. 21-1766V, 2024 WL 5266648 (Fed. Cl. Spec. Mstr. Nov. 14, 2024) (awarding $200,000 in pain and suffering); Fiumara v. Sec'y of Health & Hum. Servs., No. 23-138V, 2024 WL 4930694 (Fed. Cl. Spec. Mstr. Oct. 30, 2024) (awarding $197,500 in pain and suffering); Merchant v. Sec'y of Health & Hum. Servs., No. 20-0450V, 2022 WL 17819548 (Fed. Cl. Spec. Mstr. Nov. 7, 2022) (awarding $170,000 in pain and suffering). Although none of these cases match Mr. Farrell's case perfectly, they illustrate how special masters have compensated people who have suffered from a demyelinating disease for about five years.

## VI.    Conclusion

Mr. Farrell established that his receipt of a vaccine caused him an injury. Congress created the Vaccine Program to compensate people like Mr. Farrell. Here, the evidence supports a finding that a reasonable amount of compensation for the pain, suffering, and emotional distress that Mr. Farrell has incurred is $210,000.

**A lump sum of $210,000 shall be paid through an ACH deposit to petitioner's counsel's IOLTA account for prompt disbursement to petitioner.**

The Clerk's Office is instructed to enter judgment in accord with this decision unless a motion for review is filed. Information about filing a motion for review, including the deadline, can be found in the Vaccine Rules, which are available on the website for the Court of Federal Claims.

**IT IS SO ORDERED.**

s/Christian J. Moran
Christian J. Moran
Special Master